# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cr-00007 |
| | ) | CHIEF JUDGE CRENSHAW |
| SAMER WALID ABDALLA | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

On June 17, 2018, members of the Fifteenth Judicial Drug Task Force executed a warrant to search a residence located at 332 New Hope Road, Alexandria, Tennessee. As a result of the search and a subsequent interrogation, Samer Walid Abdalla was charged in this Court in a one-count Indictment with possessing five firearms after having previously been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924. He has filed a Motion to Suppress (Doc. No. 20), that has been exhaustively brief by the parties (Doc. Nos. 20, 22, 24, 27, and 28), and which was the subject of an evidentiary hearing on July 31, 2018. For the reasons that follow, the Motion will be granted in part and denied in part.

## I. Discussion

Abdalla's Motion to Suppress is multi-faceted. He seeks to suppress both the fruits of the search (the firearms), and statements he made, both at the scene of his arrest and while in custody. He also requests a hearing pursuant to pursuant to Franks v. Delaware, 438 U.S. 154 (1978).

**A. Motion to Suppress the Fruits of the Search**

Abdalla first moves to suppress the firearms that were found in his residence because the information used to obtain the search warrant was allegedly stale. According to the Search Warrant Affidavit, three controlled buys of narcotics were made over a span of four months. More specifically, it states that (1) on February 2, 2017, a confidential informant ("CI") went to the New Hope Road residence, "made contact" with Courtney Paris, and purchased $90 worth of heroin while Abdalla and Ernest Tanner were in the home; (2) on March 16, 2017 the CI went to the residence and made contact with both Abdalla and Paris and purchased $150 worth of heroin; and (3) on June 2, 2017, the same events were repeated with the CI making contact with both Abdalla and Paris, but this time a Ruger 9mm pistol was displayed.

"In the context of drug crimes, information goes stale very quickly 'because drugs are usually sold and consumed in a prompt fashion.'" United States v. Brooks, 594 F.3d 488, 493 (6th Cir. 2010) (quoting United States v. Frechette, 583 F.3d 374, 378 (6th Cir. 2009)). Nevertheless "[w]hether information is stale in the context of a search warrant turns on several factors, such as 'the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), [and] the place to be searched (mere criminal forum of convenience or secure operational base?).'" Id. (quoting United States v. Hammond, 351 F.3d 765, 771–72 (6th Cir. 2003)). Simply put, "'[t]he function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate.'" United States v. Spikes, 158 F.3d 913, 923 (6th Cir. 1998) (quoting United States v. Henson 848 F.2d 1374, 1382 (6th Cir.1988)).

Here, the last purchase was made one week before the application for the search warrant. By itself, this does not render the information from the CI stale. See United States v. Jeanetta, 533 F.3d 651, 655 (8th Cir. 2008) ("Standing alone, the fact the controlled buy was made two weeks before the warrant issued does not render the information in the application stale."); United States v. Ortiz, 143 F.3d 728, 732-33 (2d Cir. 1998) (citation omitted) ("In investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale."). Besides, "even if a significant period of time elapsed, it is possible the magistrate judge may infer that a search would uncover evidence of wrongdoing." United States v. Pinson, 321 F.3d 558, 565 (6th Cir. 2003).

Such an inference could easily be made in this case. Three purchases were made from two individuals in the residence in a four month period. This suggests not a "chance encounter in the night," but rather purchases from "a secure operational base." Moreover, a 9mm handgun was displayed during the last purchase. While Abdalla correctly points out that DeKalb County Judge David A. Patterson issued the Search Warrant after finding probable cause to believe that felony trafficking or felony money laundering might be occurring at the New Hope road premises, the judge also described the evidence to be seized as including "firearms, ammunition, [and] receipts of purchase of firearms[.]" (Doc. No. 20-1 at 14-15). Any reasonable jurist knows that ""drugs and guns go 'hand in hand'" and that "firearms are tools of the drug trafficking trade." United States v. Hornbeak, 575 F. App'x 618, 621 (6th Cir. 2014) (citation omitted). Accordingly, the firearms will not be suppressed on the grounds that the information in the warrant was stale.

In his Second Supplemental Brief, Abdalla argues that the search warrant was improperly issued because there was insufficient information supplied to Judge Patterson to determine whether

3

the CI was reliable. Arguing the typical indicia of reliability was lacking, he writes:

> There is no statement that the confidential informant was reliable or had been used before. There is no statement that the confidential informant was named to the magistrate judge. There is no statement that officers searched the confidential informant before and after the controlled purchases, which is in many ways the very definition of a "controlled" purchase. Although we are told that the confidential informant was given "buy money," there is no statement that it was pre-recorded or otherwise documented. Although we are told that the confidential informant was issued "monitoring equipment," there is no statement that officers used this equipment to monitor the confidential informant. There is no statement that the drugs allegedly acquired in the controlled purchases were field-tested positive for narcotics. In fact, we now know that they were not tested until months later, and the powder purchased in one of the three controlled buys contained no narcotics at all.

(Doc. No. 28 at 4).

Were the Court addressing the issue of probable cause in the first instance, Abdalla's arguments might have some purchase. However, the Supreme Court has "repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." Illinois v. Gates, 462 U.S. 213, 236 (1983). Instead, "reviewing courts are to accord the magistrate's determination 'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000).

"[I]ndependent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause," United States v. McCraven, 401 F.3d 693, 698 (6th Cir. 2005), but, "in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration." United States v. Frazier, 423 F.3d 526, 532 (6th Cir. 2005). Stated somewhat differently, "an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." United States v. Coffee, 434 F.3d 887, 893 (6th Cir. 2006) (citation omitted); see also United States v. Tuttle, 200 F.3d 892, 894 (6th

Cir. 2000) (noting that "information received from an informant whose reliability is not established may be sufficient to create probable cause when there is some independent corroboration by the police of the informant's information"). Ultimately, the issuing judge must answer "the commonsense practical question whether there is 'probable cause to believe that contraband or evidence is located in a particular place.'" Gates, 462 U.S. at 230

Judge Patterson could properly conclude from the Search Warrant Affidavit that illegal narcotics would be found at 332 New Hope Road. He was presented with information that a CI had made narcotics purchases there, not once, but on three occasions in the past few months. He was also informed that the CI had been issued "monitoring equipment and drug buy money," and that, after each transaction, the "evidence [wa]s logged into the 15th Drug Task Force Evidence." (Doc. No. 20-1 at 8). Further, the Search Warrant Affidavit stated that, on the first two occasions, the CI and an undercover agent were "surveilled" going to the house; on the third occasion an undercover agent drove the CI to the residence. (Id.).

While the Search Warrant Affidavit could have been more detailed and written clearer, "line-by-line scrutiny" is inappropriate and an "affidavit should be reviewed in a commonsense rather than a hypertechnical-manner." United States v. Woosley, 361 F.3d 924, 926 (6th Cir. 2004). Even though the search warrant affidavit does not state that the CI had proven reliable in the past, by the time he made his third purchase, the CI had successfully purchased what he thought to be heroin[1] from the residence at 332 New Hope Road on two prior occasions. See United States v.

---

[1] In his Supplemental Brief, Abdalla notes that a September 2017 report from the Tennessee Bureau of Investigations indicates the substance purchased on February 2, 2017 contained "no controlled substances." (Doc. No. 28 at 2). From this he argues that "[one] third of the probable cause in the warrant was likely baking soda or some other benign powder." (Id.). This argument goes nowhere.

There is absolutely nothing in the record to suggest that either the CI or the occupants of 332 New

5

Greene, 250 F.3d 471, 480 (6th Cir. 2001) ("Circuit precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable."). Abdalla's suggestion that the transactions were not monitored and the buy money was not recorded is untrue (as he now knows). Besides, "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added," United States v. Allen, 211 F.3d 970, 975 (6th Cir. 2000), and Judge Patterson was required to read the Search Warrant Affidavit "in a commonsense and realistic fashion," Coffee, 434 F.3d at 892. Based on such a reading, he could have properly concluded that the monitoring equipment was used, the money was recorded, and the CI was watched going to and from the residence.

Abdalla also moves to suppress the firearms on the ground that the Search Warrant was executed on the wrong house. He notes out that, immediately above Judge Patterson's signature is the command that officers search the residence and buildings located at 245 Carey Road in Hartsville, Tennessee. Not only is this the incorrect address, Hartsville is located in Trousdale County, while Alexandria is located in DeKalb County.

In support of his position that suppression is necessary, Abdalla relies on United States v. Durk, 149 F.3d 464 (6th Cir. 1998) for the proposition that "[i]t goes without saying that a search warrant that only authorizes search of the *wrong home* creates a high likelihood that officers would have searched the wrong premises in relying on this search warrant." (Doc. No. 20 at 9) (emphasis in original). He also quotes that case for the observation that a court's inquiry should be on whether

---

Hope Road entered into an agreement to purchase $90 worth of non-narcotic powder. The only evidence before the Court is that the CI went to the address to purchase heroin. That later tests revealed the substance not to be heroin is beside the point because, under Tennessee law, it is a felony to sell a "counterfeit controlled substance." Tenn. Code Ann. § 39-17-423.

6

the place to be searched is "described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched." (Id., quoting Durk, 189 F.3d at 465).

In reality, Durk supports the Government's position that the firearms should not be suppressed. In that case, an officer seeking a warrant twice transposed the address number from 4216 Fulton, Royal Oak, Michigan, to 4612. He also identified the house as being approximately 3 houses to the east of Grandview when, in fact, it was 3 houses to the west. Upholding the execution of the search warrant, the Sixth Circuit wrote:

> The evil that the framers of the Constitution were trying to eradicate with the particularity requirement was the so-called general warrant that allowed officers to search at random. This requirement eliminates generalness and provides both a reason for and limitation of the search. These purposes were served in this case as the warrant sufficiently describes [defendant's] house despite the two inaccuracies. The warrant correctly identifies the house as a single-family red brick ranch home on the north side of Fulton street. Although brick, ranch style homes may be common in [defendant's] neighborhood, the warrant also describes a more unusual feature: a ten by fifteen foot metal storage shed, the entrance of which is secured by a plastic tie. . . . Courts routinely have upheld warrants, such as the one at issue, "where one part of the description of the premises to be searched is inaccurate, but the description has other parts which identify the place with particularity."

Durk, 149 F.3d at 466 (internal citations omitted).

Even more so in this case than in Durk, "no reasonable probability existed that the officers would search the wrong premises as a result of the inaccuracies in the warrant." 149 F.3d at 466. While the address above the judge's signature was wrong, that was clearly the result of Agent Brandon Gooch cutting and pasting from an earlier warrant. Regardless, in the first paragraph of the warrant the address is correctly stated, with clear and detailed directions to the residence. Specifically, the warrant provides:

7

> TO ARRIVE AT THESE PREMISES, TRAVELING WEST ON I-40 TAKE EXIT RAMP 254. TURNING LEFT ONTO ALEXANDRIA HIGHWAY AND TRAVELING SOUTH 6.8 MILES TO DEKALB COUNTY LINE. CONTINUE TRAVELLING [SIC] SOUTH ON ALEXANDRIA HIGHWAY FOR 0.5 MILES. TO THE INTERSECTION OF ALEXANDRA [SIC] HIGHWAY AND NEW HOPE RD. TURNING LEFT ON TO NEW HOPE RD AND TRAVELING EAST FOR 0.1 MILE TO THE DRIVEWAY OF 332 NEW HOPE ROAD LOCATED ON THE RIGHT SIDE OF ROADWAY.

(Doc. No. 20-1 at 13). Lest there be any misunderstanding, the warrant also described what the premises looked like:

> ON [THE] PROPERTY THERE WILL BE A WHITE DOUBLE WIDE TRAILER WITH A GREEN FRONT PORCH AND A BLACK SHINGLE ROOF. IN THE BACK YARD THERE WILL BE A ALUMINA [SIC] BUILDING WITH AN UP STAIRS PORCH. ALSO ON THE FRONT PORCH OF THE DOUBLE WIDE THERE WILL BE AN AMERICAN FLAG AND AT THE ENTRANCE OF THE DRIVE WAY THERE WILL BE AN AUTO DETAIL SIGN.

(Id.). Absent exact GPS coordinates, the actual location of the search could not have been any clearer. Nor could any officer mistake this house for the one in Trousdale County, unless that residence, too, was a black shingled, white double wide trailer, flying an American flag, with an aluminum building on the premises and an auto detail sign at the entrance to the driveway. There is no evidence of that in the record.

Additionally, Agent Gooch, who drafted the affidavit, also participated in the search, and the Sixth Circuit "has previously upheld searches conducted pursuant to warrants listing incorrect addresses or property descriptions in part because the police officers involved in executing the search had also served as affiants or were otherwise familiar with the location to be searched." Knott v. Sullivan, 418 F.3d 561, 569 (6th Cir. 2005). Not only that, a pre-search briefing was held during which the other officers were provided the address and a description of the residence to be search, and they then traveled by caravan to 332 New Hope Road.

Moreover, and as in Durk, "additional circumstances" as set forth in the affidavit for search, "make clear that the inaccuracies in the warrant here would not lead to a mistaken search of other premises." 189 F.3d at 466. While "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents," this is not to "say that the Fourth Amendment prohibits a warrant from cross-referencing other documents." Groh v. Ramirez, 540 U.S. 551, 557 (2004). "Indeed, most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." Id. at 557-58. This includes the Sixth Circuit. Sanders v. Parrish, 141 F. App'x 412, 416 (6th Cir. 2005) (collecting cases); United States v. Blakeney, 942 F.2d 1001, 1024 (6th Cir. 1991).

Incorporation requires "'suitable words of reference' evidencing the magistrate's explicit intention to incorporate the affidavit.'" United States v. Brown, 49 F.3d 1162, 1175 (6th Cir. 1995) (citation omitted). That said, the "'realities of administration of criminal justice,' . . . counsel against an overly exacting standard for determining when a warrant successfully incorporates a supporting affidavit," United States v. Maxwell, 920 F.2d 1028, 1033 (D.C. Cir. 1990), and, hence, "there are no required magic words of incorporation." United States v. SDI Future Health, Inc. 568 F.3d 684, 700 (9th Cir. 2009). In fact, a warrant that stated "upon the sworn complaint made before me there is probable cause to believe" was deemed sufficient, United States v. Vesikuru, 314 F.3d 1116, 1120–21 & n.4 (9th Cir.2002), as was the statement, "See attached affidavit," Rivera Rodriguez v. Beninato, 469 F.3d 1, 5 (1st Cir. 2006).

Contrary to Abdalla's argument, Judge Patterson more than sufficiently incorporated the Search Warrant Affidavit into the Search Warrant. Not only did he sign the Affidavit noting that

9

it had been subscribed and sworn to before him, he specifically based his probable cause determination on the fact that "PROOF HAVING BEEN MADE BEFORE ME AND REDUCED TO WRITING AND SWORN TO BY AGENT BRANDON GOOCH OF THE 15th JUDICIAL DISTRICT DRUG TASK FORCE." That affidavit, in turn, correctly identified the premises, going so far as to contain the heading:

>APPLICATION FOR SEARCH WARRANT
>TO SEARCH THE REAL PROPERTY OF
>
>ERNEST TANNER
>SAMER ABDALLA
>COURTNEY PARIS
>
>332 NEW HOPE ROAD, ALEXANDRA [SIC]
>DEKALB COUNTY,
>TENNESSEE

(Doc. No. 20-1 at 2).

Ultimately, "[t]he test for determining the sufficiency of the description of the place to be searched . . . can be divided into two components: (1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched." United States v. Gahagan, 865 F.2d 1490, 1496–97 (6th Cir. 1989). Here, the record reflects that the residence was described with more than sufficient detail such that there was no reasonable probability that the wrong residence would be searched. Therefore, the firearms that were found in the home will not be suppressed on the ground that the Search Warrant at one point contained an incorrect address.

B. **Motion to Suppress Statements**

Abdalla moves to suppress statements that he made after he was read his Miranda rights on

the grounds that they were not voluntary. There are two such statements at issue. The first statement was made immediately after his arrest on June 9, 2017, at the New Hope Road residence. The second statement was made several days later at the DeKalb County Jail. No written waiver was executed by Abdalla for either statement, nor was the reading of the Miranda rights and Abdalla's voluntary relinquishment of those rights recorded, even though one of the officers recorded a part of the second statement on his cell phone after Abdalla had been read his rights.[2]

"Before the police may interrogate a suspect in custody, they must first read the Miranda warnings." United States v. Pacheco-Lopez, 531 F.3d 420, 423 (6th Cir. 2008) (citing Miranda v. Arizona, 384 U.S. 436 (1966)). "Miranda holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.'" Moran v. Burbine, 475 U.S. 412, 420-21 (1986) (citations omitted). There are "two distinct dimensions" to the inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

---

[2] Obviously it would have been better for the officers to have Abdalla sign a written waiver or record the reading of the rights and acknowledgment. "That fact, however, is not determinative, as the record clearly reflects by a preponderance of the evidence that [defendant] knowingly and voluntarily waived his Miranda rights," United States v. Adams, 583 F.3d 457, 467 (6th Cir. 2009), at least with respect to the second statement. See North Carolina v. Butler, 411 U.S. 369, 371, 373 (1979) (rejecting inflexible rule requiring waiver where defendant stated, "I will talk to you but I am not signing any form"); United States v. Miggins, 302 F.3d 384, 397 (6th Cir. 2002) (observing that "no authority . . . can be found, for the proposition that a written waiver is necessary to establish a knowing, intelligent and voluntary waiver of Miranda rights").

Moran v. Burbine, 475 U.S. 412, 421 (1986) (citation omitted).

"For a defendant's confession to be involuntary, and therefore obtained in violation of the Fifth Amendment, 'coercive police activity' must have preceded the confession." United States v. Ray, 803 F.3d 244, 266 (6th Cir. 2015). There is no evidence of such tactics in this case. Instead, Abdalla argues that his statements should be suppressed because his excessive drug use prohibited him from having the requisite mental capacity to knowingly and intelligently waive his rights.

"It is well-established, in this circuit and others, that mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a Miranda waiver was knowing and intelligent. Thus, diminished mental capacity alone does not prevent a defendant from validly waiving his or her Miranda rights." Garner v. Mitchell, 557 F.3d 257, 264–65 (6th Cir. 2009) (collecting cases). "Rather, that factor must be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to, the interrogation." Id.; see also United States v. Anderson, 695 F.3d 390, 395 (6th Cir. 2012) (affirming that the Sixth Circuit "looks to the 'conduct, speech, and appearance' of the accused 'during, and leading up to, the interrogation' to determine whether a Miranda waiver was knowing and voluntary").

Abdalla cites Miranda, 384 U.S. at 475, and Butler, 441 U.S. at 373 (1979), for the proposition that the "the government bears the 'great' burden of proving a valid waiver of [Miranda] rights," (Doc. No. 20 at 10), but the Supreme Court has subsequently observed that its comments about a "heavy" burden were "stated in passing" and that "the State need prove waiver only by a preponderance of the evidence." Colorado v. Connelly, 479 U.S. 157, 168 (1986); see Lego v. Twomey, 404 U.S. 477, 489 (1972) (holding that "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary," but observing that "the States are

12

free, pursuant to their own law, to adopt a higher standard"); United States v. Adams, 583 F.3d 457, 467 (6th Cir. 2009) ("It is the government's burden to establish a waiver by a preponderance of the evidence."). Either way, the Government has met its burden with respect to the second statement, but not the first.

At the evidentiary hearing, the Government did not call Mike Thompson, the Director of the 15th Judicial Task Force,[3] who was the person that actually read Abdalla his rights in relation to the first statement. Instead, Agent Gooch was called.

Agent Gooch testified that he was present when Thompson recited from memory the Miranda warnings to Abdalla. He testified that Abdalla (1) appeared calm and coherent; (2) did not appear to be intoxicated; (3) appeared to be oriented as to time and place; (4) did not ask that the rights be repeated or indicate that he did not understand his rights; and (5) nodded appropriately while the warning were being given. Agent Gooch also testified that Abdalla verbally relinquished his Miranda rights, and appeared to do so knowingly and voluntarily.

Even though the Court finds Agent Gooch's testimony on this score entirely credible, it only goes so far. Agent Gooch conceded that his observations were limited to the few minutes or seconds required to advise Abdalla of his Miranda rights. As such, he was not in a position to testify regarding Abdalla's conduct during, or leading up to, the interrogation.

According to the testimony of Rebecca Wright, a Putnam County Sheriff's Deputy, when officers arrived at 332 New Hope Road they made a forcible entry into the premises. Abdalla was located in the bedroom wearing nothing but shorts, and lying next to his girlfriend. Realizing people had entered his bedroom, Abdalla became startled and began fighting with the officers. In a later

---

[3] Apparently, Director Thompson was vacationing in Wisconsin at the time.

interview, Abdalla explained that he had injected heroin and fentanyl and taken methamphetamine before the raid, and that he thought he was in a video game when he was fighting with the officers. This is, of course, self serving. Regardless, Deputy Wright testified that Abdalla tried to bite two officers and came close to being shot during the struggle. As it happened, it took four officer to subdue Abdalla. Even when he was placed in flex-cuffs he managed to break them, something Deputy Wright had never seen before.

While there was some testimony at the evidentiary hearing that Abdalla had calmed down and became coherent between the time of the fraças with the officers and the interview with Director Thompson, the Court cannot make such a finding based upon the preponderance of the evidence. Nor does it have any evidence about what transpired during the interrogation because Director Thompson did not testify. Accordingly, the Court will suppress the statements that Abdalla made to Director Thompson at the New Hope Road residence.

The Court will not, however, suppress the statements made by Abdalla at the DeKalb County Jail on June 12, 2017 because the same evidentiary infirmities do not exist. To the contrary, while Deputy Wright conceded learning from Abdalla during his statement that he was a drug addict who used 3 grams of heroin or fentanyl a day, had used both methamphetamine and fentanyl on the morning of his arrest, and that withdrawal from drugs could be painful and take some time, she did not recall ever hearing Abdalla say that he was "dope sick," nor did she see the need to request medical treatment  She also testified that she read Abdalla his rights. Although Abdalla agreed to talk to her, he would not sign the waiver she provided him, which, as already noted, is not fatal. Upon further questioning by the Court, Deputy Wright said that on the morning of the 12th, Abdalla appeared normal, and that he was talkative, cordial and engaging. She further testified that he was

clean, groomed and coherent, and did not appear to be under the influence of any narcotics. Further, his speech was clear and Abdalla was easy to understand. The Court finds Deputy Wright's testimony entirely credible and, therefore, the June 12, 2017 statement will not be suppressed.

## C. Request for a *Franks* Hearing

The standards relating to a Franks hearing have been stated on countless occasions, and the Court need not reinvent the wheel. For present purposes, the following summary suffices:

> In Franks, the United States Supreme Court recognized a "defendant's right to challenge the sufficiency of an executed search warrant by attacking the veracity of the affidavit supporting the warrant," and "granted defendants a limited right to an evidentiary hearing concerning the veracity of the affidavit." United States v. Fowler, 535 F.3d 408, 415 (6th Cir. 2008). "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." Franks v. Delaware, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Thus, "[a] defendant is entitled to a Franks hearing if he: 1) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." United States v. Rose, 714 F.3d 362, 370 (6th Cir. 2013) (citing Franks, 438 U.S. at 171–72, 98 S.Ct. 2674).
>
> Both prongs must be satisfied before a hearing is required. "Therefore, 'if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.'" United States v. Mastromatteo, 538 F.3d 535, 545 (6th Cir. 2008) (quoting Franks, 438 U.S. at 171–72, 98 S.Ct. 2674). If, however, "both prongs are satisfied and at the evidentiary hearing, 'the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search' suppressed.'" United States v. Graham, 275 F.3d 490, 505 (6th Cir. 2001) (quoting Franks, 438 U.S. at 156, 98 S.Ct. 2674).

United States v. Brown, 68 F. Supp. 3d 783, 791–92 (M.D. Tenn. 2014), aff'd, 857 F.3d 334 (6th Cir. 2017). With this standard of review, it is clear that a Franks hearing is inappropriate.

15

At the evidentiary hearing, counsel limited Abdalla's request for a <u>Franks</u> hearing to the issue of the failure of the Search Warrant Affidavit to explain that the amount of heroin (real or counterfeit) purchased on each occasion was approximately 3 to 5 grams, and that Abdalla allegedly used 3 grams daily. In his view this small amount goes to the issue of staleness because, presumably, a personal user is less likely to deal than a big-time trafficker.

Abdalla's argument relates to an act of omission, not commission, and the Sixth Circuit "has repeatedly held that there is a higher bar for obtaining a <u>Franks</u> hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." <u>Fowler</u>, 535 F.3d at 415. That court has explained:

> [A] Franks hearing is only merited in cases of omissions in "rare instances." . . . "This is so because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." To merit a hearing, the defendant must make a preliminary showing that the affiant engaged in deliberate or reckless disregard of the truth in omitting the information from the affidavit. The court must then consider the affidavit along with the omitted portions and determine whether probable cause still exists.

<u>United States v. Graham</u>, 275 F.3d 490, 506 (6th Cir. 2001)(citation omitted).

Leaving aside that dealing heroin is unlawful no matter the amount, Abdalla has not shown this to be the rare case warranting a <u>Franks</u> hearing, or that Agent Gooch knew of Abdalla's consumption habit, yet deliberately or recklessly excluded that information from the Search Warrant Affidavit. Regardless, Judge Patterson could not have been misled into thinking that Abdalla was a large drug trafficker because he was specifically informed that the purchase amount on the first occasion was $90 of heroin, and on both of the last two occasions it was $150 worth of heroin.[4]

---

[4] Additionally, in regard to the last purchase, the Search Warrant Affidavit indicates that the CI "purchased 3 points of heroin for $90." (Doc. No. 20-1 at 8). The reference to "points" is likely a scrivener's error.

Besides, even if Judge Patterson was aware that the purchases were made in the 3 gram range and that this was a personal use amount (at least for Abdalla), this does not change the fact that the New Hope Road residents had enough additional heroin to make sales to others on at least three occasions.

## II. Conclusion

For the foregoing reasons, Abdalla's Motion to Suppress Evidence (Doc. No. 20) will be granted in part and denied in part. The Motion will be granted with respect to the statements he made to Director Thompson at the scene of the search on June 9, 2017, but in all other respects will be denied. His request for a Franks hearing will also be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE